**In the Interest of L. N., a child.**

Linda DAHLQUIST, Director of Walsh County Social Services, Walsh County, North Dakota, Petitioner and Appellee,

v.

L. N., said child, Respondent,

and

V. N., mother of said child, Respondent and Appellant.

Civ. No. 10146.

Supreme Court of North Dakota.

May 27, 1982.

John F. Burke, States Atty., Grafton, for petitioner and appellee.

Nicholas B. Hall, of DePuy, Kopperud, Goulet & Hall, Grafton, Guardian ad litem for said child.

Dahl, Greenagel, Currie, Geiger & Petersen, Grafton, for respondent and appellant; argued by M. Richard Geiger, Grafton.

ERICKSTAD, Chief Justice.

This is an appeal by Virginia (a pseudonym) from an order of the Juvenile Court of Walsh County, dated December 8, 1981, terminating her parental rights to her child, Lee (a pseudonym). We reverse.

Lee was born to Virginia on July 10, 1979, and his father is unknown. At the time of the termination hearing during October, 1981, Virginia was 21 years old. Lee has resided with and received his primary care from Virginia who, prior to the summer of 1981, resided in her father's home at Park River. During the summer of 1981, Virginia moved with Lee to her own apartment in a low cost housing development at Park River.

Subsequent to a hearing held during May, 1980, the juvenile court determined that Lee was a deprived child and ordered that his legal custody be placed with the Walsh County Social Services Board. Physical custody of Lee remained with Virginia upon her agreement with the social service board to participate in a number of programs including a program of alcohol and drug evaluation at the Center for Human Development, a homemaker program to assist Virginia with certain homemaking and parenting skills, the WIC (Women Infant Children) supplemental assistance program, a medical screening program available through Early Periodic Screening Diagnosis and Treatment, and a program of psychological testing for Virginia. She participated to varying degrees in all of these programs. During May, 1981, a representative of the Walsh County Social Services Board filed a petition requesting that Virginia's parental rights be terminated with respect to Lee. Subsequent to a termination hearing held on October 20, 1981, the juvenile court entered its order terminating Virginia's parental rights from which she has appealed. Virginia asserts on appeal that the record does not establish with clear and convincing evidence those elements necessary to terminate her parental rights.

Pursuant to Section 27–20–44(1)(b), N.D. C.C.:

"1. The court by order may terminate the parental rights of a parent with respect to his child if:

\*　　\*　　\*　　\*　　\*　　\*

"b. The child is a deprived child and the court finds that the conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm; ..."

Before a juvenile court may terminate parental rights under the foregoing section, the state must establish the following three factors by clear and convincing evidence adduced at the juvenile hearing: (1) that the child is a deprived child, (2) that the conditions and causes of the deprivation are likely to continue or will not be remedied, and (3) that by reason of the continuous or irremediable conditions and causes, the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm. *Kleingartner v. D.P.A.B.*, 310 N.W.2d 575 (N.D.1981); *In Interest of R. H.*, 262 N.W.2d 719 (N.D.1978); *In Re H.*, 206 N.W.2d 871 (N.D.1973).

Section 27–20–02(5)(a), defines a deprived child:

"5. 'Deprived child' means a child who:

"a. Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for one child's physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of one child's parents, guardian, or other custodian; ..."

The term "proper parental care" means that the parents' conduct in raising their children must satisfy the minimum standards of care which the community will tolerate. *In Interest of J. K. S.*, 274 N.W.2d 244 (N.D.1979); *In Interest of R. H.*, 262 N.W.2d 719 (N.D.1978). To terminate parental rights it is not sufficient to show parental misconduct without showing

that there is a resulting harm to the child nor is evidence of past deprivation sufficient without showing present deprivation the conditions and causes of which are likely to continue or will not be remedied. *Kleingartner v. D.P.A.B.*, 310 N.W.2d 575 (N.D.1981).

■ A child can be determined to be deprived even though the parents have not had custody of the child providing there is sufficient prognostic evidence to establish that the parents are presently incapable of providing proper parental care and that the inability to provide proper care will continue long enough to make it improbable that the child could be successfully assimilated into a family if parental rights are not terminated. *Waagen v. R. J. B.*, 248 N.W.2d 815 (N.D.1976); *In Re H.*, 206 N.W.2d 871 (N.D.1973).

■ Although the findings of the juvenile court are entitled to appreciable weight, our review of decisions under the Uniform Juvenile Court Act, Chapter 27–20, N.D.C.C., is equivalent to the former procedure of *trial de novo*. *Kleingartner v. D.P.A.B.*, 310 N.W.2d 575 (N.D.1981). In its findings of fact in this case the juvenile court found, upon clear and convincing evidence, that Lee is a deprived child; however, the court did not make any specific findings of fact demonstrating the grounds upon which it made its finding of deprivation. Such specific findings by the juvenile court would have provided valuable assistance to this Court in reviewing the record to determine whether or not there is clear and convincing evidence of the elements necessary to terminate parental rights.

■ The record of the proceedings during May, 1980, upon which the juvenile court made an initial determination that Lee was a deprived child, is not before this Court. Furthermore, it would be improper for purposes of this parental termination proceeding to take judicial notice of the prior proceedings of May, 1980, wherein the termination notice requirements of Section 27–20–45, N.D.C.C., were not met in the previous proceedings. *In Interest of R. H.*, 262 N.W.2d 719 (N.D.1978). Consequently, it is our task on this appeal to review only the record of the 1981 termination proceedings to determine whether or not there is clear and convincing evidence justifying termination of Virginia's parental rights with respect to Lee.

■ The record contains undisputed evidence that Virginia maintains a clean, well-kept home and that Lee has been adequately fed and clothed under her care. In addition, the record establishes, without dispute, that Lee is a well-behaved and lovable child. A psychologist who counseled Virginia and Lee during family therapy sessions testified that, as a result of the care Lee has received, he is a happy, normally developed child.

However, the record also includes the following relevant evidence which demonstrates that Virginia has had various problems with respect to her parenting responsibilities and that she has, on occasion, exhibited certain undesirable behavior:

(1) Diane Bratlie, a social worker for the Walsh County Social Services Board, conducted an investigation of Virginia based upon three abuse and neglect reports which were filed by nurses at the hospital in Park River as a result of a number of emergency room admissions that Lee had in the course of approximately one and one-half years. In addition to a hospitalization for a severe reaction to a DPT shot, a hospitalization for pneumonia, and another hospital admission for observation of a high fever, Lee has been brought to the emergency room on several occasions for injuries sustained in accidents such as falling down steps or being hit on the head by a swing.

Diane testified that there was nothing in her investigation which indicated that the injuries occurring to Lee on those occasions were caused by parental abuse. She testified that while none of the hospitalizations or emergency room admissions were life threatening Lee had experienced more hospitalizations and had received more emergency room treatment than an average child and that "it appeared that a portion of

the emergency room treatments were because of perhaps a lack of judgment to decide what sort of medical treatment was needed at home." However, on cross-examination Diane agreed that it is better for a parent to have her child checked by a doctor, even though the doctor concludes that treatment is unnecessary, than to ignore the situation when the parent is uncertain whether or not the child needs treatment by a doctor.

(2) There was testimony that Virginia disciplines Lee at times by slapping him across the face or back with an open hand and also by spanking him when he has done little, if anything, to deserve such discipline. Virginia's sister testified that she observed Virginia slap Lee with sufficient force to cause "slap marks".

However, the record contains no evidence indicating that Virginia's discipline ever caused bruises or other physical injury to Lee.

(3) An alcohol evaluation was performed on Virginia by a counselor, Mike Bryan, who determined that Virginia had abused alcohol in the past which could be a problem if she continued to drink.

Mike did not believe there was a need for further counseling at the time of the evaluation. The record does not indicate that Virginia currently abuses alcohol so as to negatively affect her parental functioning.

(4) There was testimony by Kris Heine, a social worker for the Walsh County Social Services Board, that Virginia had, in the past, too frequently left Lee with different babysitters which, in Kris's opinion, demonstrated that Virginia was too concerned with meeting her own needs and not sufficiently concerned with meeting Lee's needs.

The record contains very little specific evidence regarding the frequency that Virginia would leave Lee with babysitters or the circumstances surrounding such occasions. Furthermore, there is no evidence in the record that Virginia ever left Lee alone or without proper adult supervision.

(5) There is evidence that Virginia has a rather severe temper and that on one occasion she assaulted another woman.

The assault incident apparently occurred at a bowling alley, and Lee was not present.

(6) There is evidence of one occasion when Lee was approximately one year old that Virginia gave him two full eyedroppers of Tylenol medication saying, "Now that will take care of you, you little bastard."

There was no evidence, however, as to the anticipated effect that such a dose of Tylenol would have on a child of Lee's age and weight at that time. Nor was there evidence that Lee suffered any harm as a result of this incident.

Upon reviewing the entire record, including the foregoing matters, we are convinced that there is not clear and convincing evidence to establish that Lee is a deprived child who, under Virginia's care, has received less than the minimum standard of care which the community will tolerate. The following words of Justice Sand in the case of *In Interest of M. M. C.*, 277 N.W.2d 281 (N.D.1979) are applicable:

"In reaching our determination, we are not unsympathetic to the roles and duties of our social work agencies and their dedicated employees in attempting to provide for the best possible interests of the child. Determining what is in the best interest of the child, however, is not the primary question before the court in these cases but rather if the child is deprived as defined under the terms of the statute.

\* \* \* \* \* \*

"This Court has stated its reluctance 'to remove a child from its parents unless diligent effort has been made to avoid such separation' and unless it is necessary to prevent serious detriment to the welfare of the child' *Jacobson v. V. S., supra* at 566, quoting *Bjerke v. D. T.*, 248 N.W.2d 808, 814 (N.D.1976). It is not reason enough to deprive parents of custody that their home is not the best, or even that they are not the best parents that could be offered to the child, so long as the child does not suffer physical or

moral harm, or lack of food or clothing." 277 N.W.2d at 286.

The Walsh County Social Services Board appears to have relied primarily upon the testimony of Dr. Leland H. Lipp, a practicing clinical psychologist, to justify the request to terminate Virginia's parental rights. Dr. Lipp testified that on the Wexler Intelligence Scale Virginia scored a verbal I.Q. of 75, a performance I.Q. of 95, and a full scale I.Q. of 93. Dr. Lipp interpreted those scores as follows:

"A. The interpretation of these scores is that her verbal intelligence, her language related ability, she could function at the borderline defective range. Her performance abilities, meaning ability to utilize visual motor skill is in the low average range. Overall she is functioning or at that time functioning at the borderline defective range in terms of social skills we usually see."

Dr. Lipp testified that it was his impression that Virginia has a defective ability in child-rearing and that the prognosis for her ability as a parent is very poor. On cross-examination Dr. Lipp testified in relevant part as follows:

"Q. That gets to my next question. You indicate her prognosis for change is poor and I guess what I am wondering, from what—what—as we have had testimony here today, and I don't know if you heard it. As far as her feeding of the child, the cleanliness of the child, the normal basics, I guess I would say, those have been met?

"A. Yes.

"Q. And so what—what changes have to occur and—well, what changes have to occur?

"A. Well, in terms of the conclusion I made I based this on several factors in the person, on immaturity. I also based it on factors of intellectual skill and her significant memory impairment. And when you group all these together, we are talking about a situation that in my opinion has a poor prognosis for the kind of change necessary to *raise a child adequately*. I include that in my evaluation and I guess by making a mature judg-

ment in terms of the stresses that occur in the development of any child. Significant consistency in terms of improvement over a long period of time; because of development in terms of all kinds of things. I guess what I am referring to is judgment factors, among other things. [Emphasis added.]

\*   \*   \*   \*   \*   \*

"Q. What do you mean, Doctor, when you say, adequately raising a child?

"A. Being able to provide the consistency, the judgment, the common sense, the stimulation sufficient for a child to reach his potential.

"Q. So you are looking at the child maximizing his potential?

"A. I am looking at the child optimizing his potential. I don't think any of us maximize our potential."

Although Dr. Lipp concedes that Virginia has met Lee's needs with regard to feeding him, keeping him clean, and providing the other "normal basics" and further concedes that upon observing Lee "I was not able on an informal basis to see anything grossly amiss" it is his opinion that Virginia's parenting skills would not allow Lee to optimize his potential. However, the statutory scheme under the Uniform Juvenile Court Act, Chapter 27–20, N.D.C.C., does not authorize a court to terminate parental rights on the prognosis that the parent's parenting skills will not be sufficient to permit the child to optimize his potential. To establish that Lee is a deprived child there must be clear and convincing evidence demonstrating that Lee, while in Virginia's care, has failed to receive the minimum standard of care which the community will tolerate. We do not believe that Dr. Lipp's testimony nor any other evidence in the record, when considered together, establishes by clear and convincing evidence that Lee is a deprived child under that standard.

Richard Dahlquist, a psychologist and director of the Center for Human Development, counseled Virginia and Lee during family therapy sessions on a weekly basis for approximately three months and thereafter twice a month until the sessions were discontinued in September, 1981. With re-

gard to Lee's development, Mr. Dahlquist testified in relevant part:

"Q. You found L. to be, as I understand, a perfectly normal two year old?

"A. L. was given the Denver Development Test on entering and upon termination, and in both cases scored within the average range. Beyond that during our sessions over the months we found L. to be a normally developed child. And we could see developmental improvement over the six months that we were involved. Improvement is incorrect. You could see appropriate development over the six months we worked with him.

\*    \*    \*    \*    \*    \*

"Q. But it is your testimony L. was normal and not developmentally delayed in any way?

"A. He is not delayed in any way we have been able to see.

"Q. Would you see [say] L. was basically a happy kid?

"A. Yes.

"Q. Would it be accurate to say he did not reach that point accidentally?

"A. Yes.

"Q. And you can attribute the fact that he got there to his Mother?

"A. I personally would, in the absence of knowing what other care, carers he might have had. Whatever the prime care was, they have met his basic needs for growing the first two years.

"Q. Would it be accurate to say L. is not deprived?

"A. No, he is not deprived."

Upon reviewing the entire record, including the foregoing evidence, we conclude that there is not clear and convincing evidence to establish that Lee is a deprived child.

The record does demonstrate that Virginia has a number of problems and deficiencies in her parenting skills which indicate that she has a continuing need for assistance to improve her ability to care for Lee from organizations such as those from whom she has received help in the past. It would be unfortunate if the organizations and the individuals who have attempted to assist Virginia would simply give up and refuse to assist her anymore. We believe the record demonstrates that Virginia has generally cooperated with those organizations and the assistance programs offered to her and that she has made progress with their help. Although this progress may seem at times to be painfully slow the record in this case simply does not establish that Lee is a deprived child at this time or otherwise establish the elements necessary for termination of Virginia's rights as Lee's parent.

On appeal Virginia asserts, as an additional issue, that the petition requesting parental termination did not meet the notice requirements of Chapter 27–20, N.D. C.C. In view of our determination that the requirements for termination of Virginia's parental rights have not been met in this case it is unnecessary for us to decide that issue.

In accordance with this opinion the order of the juvenile court terminating Virginia's parental rights with respect to Lee is hereby reversed.

VANDE WALLE, PEDERSON, PAULSON and SAND, JJ., concur.