In the Interest of R. A. S., a Child.

Clarence O. OHLSEN, Director, Grand Forks County Social Service Center, Petitioner and Appellee,

v.

S. A. S. (Natural mother), Respondent and Appellant,

C. C. S. (Stepfather), and L. M. S. (Natural father), Respondents.

Civ. No. 10111.

Supreme Court of North Dakota.

July 9, 1982.

Robert A. Alphson Law Office, Grand Forks, for respondent and appellant; argued by Lawrence D. DuBois, Grand Forks (presently of Cavalier).

Letnes, Marshall, Fiedler & Clapp, Grand Forks, for petitioner and appellee; argued by F. John Marshall, Grand Forks.

Gary R. Thune, Grand Forks, guardian ad litem.

PAULSON, Justice.

S. A. S. has appealed from the "Order on Termination of Parental Rights" entered by the Juvenile Court of Grand Forks County. We dismiss the appeal.

S. A. S. (hereinafter "Sharon," a pseudonym) is the natural mother of R. A. S. (hereinafter "Robert," a pseudonym), a nine-year-old boy. In 1976, Sharon divorced Robert's natural father, L. M. S. (hereinafter "Lee," a pseudonym), and remarried her former husband, C. C. S. (hereinafter "Curtis," a pseudonym). Sharon had previously been married to Curtis between 1960 and 1965, and three daughters were born of the marriage: Teresa and twins, Linda and Laura.

On September 8, 1978, a petition was filed alleging that Robert and Laura were deprived children. Temporary custody of Robert was placed with the Director of the Grand Forks County Social Service Center and Robert was placed in foster care. As a result of hearings held in October of 1978, the juvenile court on November 3, 1978, issued its order finding Robert to be a deprived child and continuing custody in the Director of the Grand Forks County Social Service Center for a period of one year commencing January 23, 1979. This order was extended to January 23, 1981, by stipulation of the parties.

On January 14, 1981, a petition for termination of parental rights was filed. The hearing on this petition was set for March 4, 1981, but this hearing was halted when Lee, the natural father, expressed a desire to consult with an attorney. Lee voluntarily relinquished his parental rights to Robert at a hearing on April 22, 1981. Further hearings were held in September of 1981. On October 6, 1981, the juvenile court issued its findings of fact, conclusions of law, and order for judgment, finding Robert to be a deprived child and terminating the parental rights of Sharon as to the minor child, Robert. Judgment was entered on October 15, 1981.

Sharon has appealed to this Court. Her notice of appeal states that she appeals from "the Order on Termination of Parental Rights." Although the juvenile court's order is denoted as "Order on Termination of Parental Rights," the court specifically states within the order that it is to constitute the findings of fact, conclusions of law, and order for judgment. Sharon has thus appealed from the order for judgment.

Even though the parties have not raised the issue of the appealability of the

order, it is the duty of this Court to dismiss the appeal on its own motion if the order is not appealable. *Simpler v. Lowrey*, 316 N.W.2d 330, 333 (N.D.1982); *Chas. F. Ellis Agency, Inc. v. Berg*, 214 N.W.2d 507, 509 (N.D.1974); *Trautman v. Keystone Development Corp.*, 156 N.W.2d 817, 819 (N.D. 1968). Section 27–20–56, N.D.C.C., provides that an aggrieved party may appeal from a "final order" of the juvenile court. We have previously held that an order for judgment is an intermediate order, and requires the subsequent entry of judgment to give it effect. *First National Bank of Hettinger v. Dangerud*, 316 N.W.2d 102, 104 (N.D.1982); *Gebeke v. Arthur Mercantile Co.*, 138 N.W.2d 796, 798 (N.D.1965). Thus, an order for judgment is not a final order and is not appealable. *Piccagli v. North Dakota State Health Department*, 319 N.W.2d 484, 486 (N.D.1982); *Simpler v. Lowrey, supra*, 316 N.W.2d at 333; *First National Bank of Hettinger v. Dangerud, supra*, 316 N.W.2d at 104. Because Sharon has appealed from a non-appealable order, we are without jurisdiction and must therefore dismiss the appeal.

Although we dismiss the appeal, we will comment briefly on the issues raised on the merits by the parties.[1]

■ Our scope of review of decisions under the Uniform Juvenile Court Act, Chapter 27–20, N.D.C.C., is governed by § 27–20–56(1), N.D.C.C., which provides that review is based upon the files, records, and minutes or transcript of the evidence of the juvenile court. Our review is not limited to a determination of whether or not the juvenile court's findings are clearly erroneous, but rather we are allowed to reexamine the evidence in a manner similar to the former procedure of trial de novo. *In Interest of L. N.*, 319 N.W.2d 801, 803 (N.D. 1982); *In Interest of S. W.*, 290 N.W.2d 675,

677 (N.D.1980); *In Interest of R. H.*, 289 N.W.2d 791, 793 (N.D.1980). The findings of the juvenile court are to be given appreciable weight, § 27–20–56(1), N.D.C.C., and we must take into account that the trial judge had the opportunity to observe the demeanor of the witnesses, whereas we have only the cold transcript before us. *Kleingartner v. D. P. A. B.*, 310 N.W.2d 575, 578 (N.D.1981).

The juvenile court terminated Sharon's parental rights pursuant to § 27–20–44(1)(b), N.D.C.C., which provides:

"27–20–44. *Termination of parental rights.—*

"1. The court by order may terminate the parental rights of a parent with respect to his child if:

\*    \*    \*    \*    \*    \*

"b. The child is a deprived child and the court finds that the conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm; ...."

■ Before the juvenile court may terminate the parental rights of a parent pursuant to § 27–20–44(1)(b), N.D.C.C., the State must establish the following three factors by clear and convincing evidence:

1) the child is a "deprived child";

2) the conditions and causes of deprivation are likely to continue or will not be remedied; and

3) by reason of the continuous or irremedial conditions and causes, the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm.

---

1. We note that this appeal was filed before our decisions in *Dangerud, Simpler*, and *Piccagli, supra*, were reported. We further note that the parties have fully briefed and argued the merits, and the time for taking an appeal from the judgment has expired. We will therefore briefly comment on the merits, with the caveat that our review of the merits shall not be considered a precedent in the future. *See Piccagli, supra*, 319 N.W.2d at 487; *Burich v. Burich*, 314 N.W.2d 82, 83 (N.D.1981); *State v. Gasser*, 306 N.W.2d 205, 208 (N.D.1981).

*Kleingartner, supra,* 310 N.W.2d at 578.

Sharon contends on appeal that the State failed to establish each of the above three factors by clear and convincing evidence. We have thoroughly examined the files, records, and transcripts of the juvenile court, and we conclude that the State has established the three required factors by clear and convincing evidence. The evidence produced at the various hearings in this case shows a long history of difficulties within this family. There was much testimony regarding Sharon's abuse of Robert. For example, Sharon punished Robert on occasion by striking him on the bare buttocks or hand with the steel end of a flyswatter. Sharon also disciplined Robert by striking him about the head and face. On one occasion, Sharon burned the ends of Robert's fingers with a match. On another occasion, Sharon covered Robert's head and face with masking tape, making him stumble around the room crying for a period of ten or fifteen minutes. Neighborhood children were allowed to watch and ridicule Robert during this ordeal, while Sharon sat by and laughed at him. Sharon has also told a babysitter to hit Robert with a butter knife on his bare hand if he did not behave.

There was also testimony that Sharon's lack of concern for Robert's welfare has continued during the weekend in-home visitations over the last two years. Robert's foster parents testified that he often came home from weekend visitations unwashed, and in filthy underwear and clothes, even though the foster parents sent a bag of clean clothes for Robert. There was testimony presented that Robert is fed irregularly and inadequately while visiting Sharon on weekends, and has been allowed to stay up past one o'clock in the morning while staying with Sharon. Sharon has allowed Robert to watch an R-rated movie containing profanity and nudity while he was home for a weekend visitation. Sharon has displayed absolutely no interest in Robert's school work, athletic activities, and Cub Scout activities. Sharon has on several occasions left Robert home with a babysitter during weekend visitations so that she could go play bingo, including one occasion when Robert had the chicken pox.

We believe that Sharon's treatment of her three daughters is also relevant in determining whether the deprivation in this case is likely to continue or be remedied. There was testimony presented that Sharon had beaten her daughters on several occasions, and had thrown objects, such as shoes, at them. During a five-year period between 1965 and 1970 when the girls were living with their grandmother following Sharon and Curtis's divorce, Sharon visited her children only once. During this five-year period, she never wrote to them or communicated any feelings of love to them. All three of the girls testified that they feel unloved and unwanted by their mother. Linda and Laura both testified that they were afraid to testify against their mother, and Laura stated she was "terrified" of her parents. Laura testified that she had needed Sharon's authorization to receive medical treatment for a vaginal infection, and Sharon had refused to sign the authorization. Laura was forced to get a court order so that she could be admitted to the hospital for treatment.

There was also evidence of a long history of moral deprivation of the children. Sharon had purchased beer and vodka for Linda and Laura when they were only fifteen years old. Teresa returned to the family home one evening with friends to find Sharon in bed with a man other than her husband. When Teresa was eighteen years old, Sharon allowed Teresa's boyfriend to live with Teresa for several months in her bedroom in the family home, during which time Teresa became pregnant. Sharon's primary objection to this man sleeping with her daughter in the family home was his refusal to pay her $200 per month rent. Sharon also allowed two other adult males to stay overnight in the family home when Linda and Laura were fifteen years old. These overnight visits were allowed to continue even after one of the men assaulted and made sexual advances to Linda in Cur-

tis's presence. Sharon also testified that she has continued having sexual relations with Lee after their divorce and after her remarriage to Curtis. One incident which occurred after Sharon's remarriage to Curtis was testified to by a family friend, who stated that she observed Lee fondling Sharon's breasts while Robert watched.

Dr. Leland Lipp, a licensed clinical psychologist, testified regarding Sharon's parenting abilities. He testified that Sharon "has diminished capacity, poor judgment and is psychologically unable to perform the duties and the responsibilities of raising a child," and in his opinion return of Robert to Sharon full-time would lead to regression and further physical abuse. Dr. Lipp also testified that in his opinion Robert had suffered emotionally and intellectually by being in the environment of Sharon and Curtis's home.

In addition to all of the foregoing evidence, we are presented with Sharon's repeated denials that anything is wrong with her parenting methods. The juvenile court commented on these denials in its order:

"It would seem to this Court that 20 years of effort in behalf of the welfare of this family, a major portion of which related not to financial support but to social support and counseling and direction toward a better life, and three years of hearings and the maintenance of a parental visitation schedule which the Court has hoped throughout would result in an awakening in behalf of [Sharon] of her natural instincts of motherhood and recognition by her of past mistakes, a willingness to consider alternatives to such behavior that has been exhibited in the past by her, and a hope or a resolve on her part to try to do better would readily have resulted in a dismissal of these proceedings, but throughout the Court has faced hearing after hearing the same determined denials that [Sharon] has placed before this Court and in a sense before the people of the State of North Dakota in maintaining, at least in

her own mind, the rectitude of her position. She has been stood by loyally by her husband and for that loyalty they are both to be credited.

"The Court is not here to criticize [Curtis] any more than I am here to criticize [Sharon], but if they could have seen, throughout these proceedings, that there needed to be a substantive change and recognition of the serious errors that they made with relationship to the raising of [Robert] and their older children, it would have been possible to set this family on its course again and to reduce and ultimately eliminate the involvement of the State. But the path, once shown, has been resolutely held by [Sharon] and in conjunction with her by the respondent, [Curtis], in maintaining that there was nothing wrong with what they have done and that the State's intervention in their family life should not be upheld.

"That fact too bears on the issue of whether or not the conditions that existed at the time of the removal of the child would be remedied and the Court can draw no other conclusion therefrom but that they would not because who is to change that which they are satisfied is correct."

We conclude that the State has established by clear and convincing evidence that Robert is a deprived child, that the conditions and causes of the deprivation are likely to continue or will not be remedied, and that by reason thereof Robert has suffered or will probably suffer serious physical, mental, moral, or emotional harm.

The final issue raised by Sharon on appeal is whether or not the juvenile court erred in admitting into evidence Petitioner's Exhibits 10 and 11. Exhibits 10 and 11 were public records of the Grand Forks County Social Services Center, and were in effect summaries of the family's case history with the Social Services Center. Sharon contends that these summaries contained hearsay allegations regarding Sharon's parenting made to social service workers by

third persons, and are therefore not admissible under the public records exception to the hearsay rule. Rule 803(8), North Dakota Rules of Evidence.

In *Schuh v. Allery*, 210 N.W.2d 96, 99–100 (N.D.1973), we held that a trial judge in a nonjury case may admit all evidence which is not clearly inadmissible:

"We believe that a trial judge, in a nonjury case, should ordinarily admit all evidence which is not clearly inadmissible. A judge who is competent to rule upon the admissibility of evidence can distinguish in his own mind, when deliberating his ultimate decision, between evidence which is admissible and evidence which is not admissible. The introduction of allegedly inadmissible evidence in a nonjury case will rarely be reversible error, and it may often avoid a possible reversal in cases where this court, on appeal, holds that the evidence is admissible."

In the instant case, the trial judge specifically remarked that "little or no weight will be given to matters which appear to be of a hearsay nature which are technically in the record." A careful perusal of the juvenile court's findings of fact and order indicates that the court did not place any substantial weight upon Exhibits 10 and 11, and the admission into evidence of Exhibits 10 and 11 was not reversible error.

As stated earlier herein, the order from which the appeal is taken is not appealable, and the appeal is dismissed.

ERICKSTAD, C. J., and PEDERSON, VANDE WALLE and SAND, JJ., concur.