In the Interest of M.R., A Child.

In the Interest of L.R., A Child.

In the Interest of L.R., Jr., A Child.

In the Interest of C.R., A Child.

Dan RICE, Director of Dickey County
Social Services, Petitioner
and Appellee,

v.

M.R., L.R., L.R., Jr., and C.R.,
Children, Respondents,

and

L.R., Sr., and M.R., Parents of the
above-named Children, Respondents
and Appellants.

Civil No. 10274.

Supreme Court of North Dakota.

May 31, 1983.

Ronald Goodman, Oakes, for guardian ad litem.

James Purdy, State's Atty., Ellendale, for petitioner and appellee.

Stephen M. McLean, Oakes, for respondents and appellants.

SAND, Justice.

L.R. (Lee) and M.R. (Mary) appealed from a juvenile court judgment terminating their parental rights in M.R. (Mark), L.R. (Louise), L.R. (Lance), and C.R. (Cliff) (all names are pseudonyms).

After being informed that Lee and Mary had refused to allow the Dickey County social services or area supervisor of child protection services to carry out the mandate of North Dakota Century Code Ch. 50–25.1 dealing with alleged child abuse and neglect, the director of juvenile court services for Dickey County, Robert Eastburn, issued an order, dated 30 January 1981, for temporary custody pursuant to North Dakota Century Code § 27–20–06(1)(h) placing Lee and Mary's four children, ranging in age from one year to four years, in the custody of Dickey County social services. Shelby Peterson, area supervisor for protective services for Dickey County, filed a petition, dated 23 February 1981, in juvenile court alleging that the children were physically abused and deprived [1] pursuant to the pro-

---

1. Specifically, the petition alleged in relevant part as follows:
   "That said children are deprived children and are without proper parental care or control, subsistence, education as required by Law, or other care or control necessary for their physical, mental or emotional health or morals and the deprivation is not due primarily to the lack of financial means of the parents, guardian or other custodian of said children or child, to-wit: That said children have been physically abused by the parents of said children on different dates and in addition have been denied necessary and required medical care and attention by said parents."

visions of the Uniform Juvenile Court Act (NDCC Ch. 27–20).

After a hearing on the petition on 5 March and 12 March 1981, the juvenile court found by clear and convincing evidence that Lee and Mary had physically abused Mark, Louise, and Lance by the use of a belt to discipline them. The juvenile court also found by clear and convincing evidence that all four of the children were deprived because of developmental delays suffered by each.

The juvenile court held a dispositional hearing on 23 April 1981, and, after the hearing, the juvenile court ordered the four children to be placed in a foster home until 6 August 1981 with the parents having weekend visitation rights. The court also ordered that developmental evaluations be conducted regarding all four of the children and that the results be furnished to the court prior to the 6 August 1981 hearing. The court made recommendations that the parents do several things before 6 August 1981. Among these recommendations were that the parents consent to a psychological evaluation at a mental health agency and to a medical evaluation; that they participate in counselling and follow treatment plans at a counselling agency for the purpose of improving their parenting skills; and that they participate in a Parents Anonymous group. The court set 6 August 1981 as a date for a hearing in the nature of an order to show cause for Dickey County social services office to show good cause, if any, why custody of the four minor children should not be returned to Lee and Mary.

After the order to show cause hearing on 6 August 1981, the juvenile court issued an order dated 31 August 1981, continuing placement of the four children in the foster home with weekend visitation rights for Lee and Mary. The juvenile court ordered that custody of the children continue in foster care until 6 October 1981 and that at that time the children be returned to Lee and Mary subject to conditions set out by the court. Among the conditions ordered by the court were that Lee and Mary complete physical examinations; complete psychological evaluations before 6 October 1981; attend a parents anonymous group for three months; and enter into joint family programs for the parents and children. The juvenile court also directed that the Dickey County social services board make unannounced home checks at the home of Lee and Mary once every two weeks to observe the condition of the home and the children. The court concluded its order by stating its intention that if Lee and Mary complied with the court order they would have custody of the children on 6 October 1981 and, further, that six months from the date of the order (31 August 1981) custody would be returned to the parents absent any supervision whatsoever.

On 4 February 1982, prior to the expiration of the six months, the parents left the state of North Dakota with their children and moved to Oklahoma. On 5 February 1982 the juvenile court issued an order returning temporary custody of the four children to the director of Dickey County social services because Lee and Mary left Dickey County without notifying the court or Dickey County social services, all in violation of the court order dated 31 August 1981. The children were returned to social services' custody and foster care in North Dakota in late March 1982.

Dan Rice, director of Dickey County social services filed a petition for termination of parental rights[2] dated 26 May 1982, and

---

2. The petition for termination alleged in pertinent part as follows:

"4. *North Dakota:* That a Temporary Custody Order dated January 13, 1981, was issued by Robert Eastburn, Juvenile Supervisor, involving all of the said ... children, to-wit: [Mark, Louise, Lance and Cliff], and the said children were removed from parental custody; that a Petition was filed with this Court on or about the 24th day of February, 1981, by Shel-

by Peterson, present Social Service supervisor, alleging that the said ... children to be deprived children by reason of physical abuse and denial of necessary and required medical care and attention; hearings were held thereafter on said Petition before this Court on March 5, 1981, and on March 12, 1981, and this Court did, on April 14, 1981, issue its written Order finding all [four of the] children to be deprived children. On April 23, 1981, this Court did

a hearing on the petition was held on 4 June, 7 June, and 8 June 1982. After the hearing, the court issued findings of fact, conclusions of law, and order for judgment. After an additional hearing, the findings of fact were amended, and judgment was entered terminating the parental rights of Lee and Mary with respect to the four children. Lee and Mary appealed to this court.

The first issue we will consider is whether or not the juvenile court erred in finding by clear and convincing evidence the elements necessary to terminate the parental rights of Lee and Mary. Our analysis of this issue requires consideration of two interrelated subissues dealing with the evidence the juvenile court could consider in reaching its decision.

The first subissue raised by Lee and Mary is whether or not the juvenile court took judicial notice of the deprivation hearings held on 5 March and 12 March 1981 and erred in allowing the State to order transcripts of those hearings as part of the appeal from the judgment issued after the parental termination hearing.

In *In Interest of R.H.*, 262 N.W.2d 719, 722 (N.D.1978), we said:

"Testimony admitted during a separate proceeding, where the termination of parental rights was not at issue, should not be judicially noticed, over objection, in a proceeding where a termination of parental rights is sought. Section 27–20–45, NDCC, requires that 'the petition shall ... state clearly that an order for termination of parental rights is requested and that the effect thereof will be [an order terminating all his rights and obligations with respect to the child and of the child to or through him arising from the parental termination].' See § 27–20–46, NDCC. Due process of law, required by the Fourteenth Amendment to the United States Constitution and Section 13 of the North Dakota Constitution, would be denied to the parents if the Social Service Board was permitted to import testimony from a hearing where the termination notice was not given. We have determined that it would have been improper to take judicial notice of a prior proceeding wherein the notice requirements of § 27–20–45, NDCC, were not met."

See also, *In Interest of L.N.*, 319 N.W.2d 801 (N.D.1982).

Furthermore, this Court concluded in *In Interest of R.H.*, 262 N.W.2d at 723, that deprivation shown at a previous hearing is not res judicata at a subsequent hearing to terminate the parental rights.

Lee and Mary ordered a complete transcript of the parental termination hearing held on 4 June, 7 June, and 8 June 1982. The State then ordered transcripts of the hearings held on 5 March, 12 March, 23 April, and 6 August 1981. The juvenile court ordered the transcripts of the abuse and neglect hearings to be furnished as part of the record to this Court and stated the following reasons:

"1) The transcript of the abuse and neglect hearing will give a complete picture of the progress of the children over the last two years.

"2) The transcript of the first set of hearings dealing with abuse and neglect will present full background for the deci-

Order the care, custody and control of said ... children be removed from the parents and placed with Dickey County Social Service and did thereupon place said children in a foster home; that a further hearing on this matter was held before this Court on August 6, 1981, and the care, custody and control of said children was continued with said Dickey County Social Service for an additional six month period, to February 28, 1982; that said [Lee] and said [Mary] did not, however, comply with all of the items required of them by said Court Order of August 31, 1981; that on or about

February 6, 1982, and while the Order of this Court of August 31, 1981, was yet in force and in violation of same, said [Lee] and said [Mary] did without consent of knowledge of this Court, remove themselves and all of the said ... children from the State of North Dakota.

"5.. *Oklahoma:* That on or about March 25, 1982, when [Lance] was seen by the authorities in Oklahoma, a severe bruising was present on his left buttock, which [Lance] stated was inflicted upon him when his father, [Lee] struck [Lance] with a board."

sion of the Supreme Court with respect to appellate review.

"3) Both transcripts will properly reflect the continuing character of the proceeding from abuse and neglect to termination since this Court maintained continuing jurisdiction in this matter.

"4) While the first transcript may be somewhat prejudicial to the Respondents [Lee] and [Mary], and not usable as evidence for termination of parental rights in and of itself, it does show that the Court adequately protected the rights of the Respondents throughout the proceedings and gave them adequate opportunity to present evidence and cross-examine witnesses and further supports the fairness of the Court's decision."

Based on this order, Lee and Mary contended that the juvenile court definitely took judicial notice of the prior proceedings in reaching its ultimate decision to terminate their parental rights. Furthermore, Lee and Mary asserted that the amended findings of fact established that the juvenile court erroneously relied upon evidence presented at the previous deprivation hearing in making its decision to terminate their parental rights. In particular, Lee and Mary pointed to the following excerpts from the amended findings of fact to support their position:

"That these instances of physical child abuse have been reoccurring and over an extended and rather prolonged period of time and have been observed at different times and at different living locations; That at a prior Hearing before this Court on a prior Petition concerning all of the above entitled children and the said parents, it was shown that the said parents did at that time make a practice of whipping the children on the buttocks with a belt."

We believe that particular "finding" must be read in the context of the rest of the findings of fact, which, in relevant part, provide:

"That there have been evident physical abuses inflicted upon these children by the parents or one of said parents; That [Lance] was slapped in the face by his Mother and his glasses were broken; That [Lance] was struck with a board on his left buttock by his Father, [Lee], receiving severe bruises on the left buttock; That with respect to the children in general, there have been black and blue marks and bruises in areas about the bodies of the children which are somewhat suspicious as to the location and as to the cause and indeed strongly suggested that these were inflicted by the said parents or one of said parents . . . .

.     .     .     .     .

"The said parents have reverted back to using undue physical force upon the children and the children have become introverted and their emotional and physical well-being has suffered."[3]

The record reflects that, after the initial deprivation hearing, the juvenile court imposed conditions on Lee and Mary in an effort to, and with the intent of, ultimately keeping the family together without supervision. In this respect, the conditions required continuing compliance by Lee and Mary with supervision by the County and court. We cannot expect the court to operate in a vacuum with regard to the conditions that precipitated its original order. This is particularly true because the petition for termination set forth items leading up to, and after, the deprivation hearing, and which culminated in the filing of a petition for termination. Furthermore, the evidence introduced at the termination hearing laid a foundation for events happening after the juvenile court order of 31 August 1981 by setting forth some of the basic facts which transpired before that order.

■ Although case law and due process concepts contemplate that judicial notice may not be taken of testimony adduced at

---

**3.** Part of the finding quoted in the text is part of the same sentence which Lee and Mary asserted established that the juvenile court took judicial notice of the previous deprivation hearing.

the prior proceedings wherein the termination notice requirements of NDCC § 27–20–45 were not met; nevertheless, we do not believe the juvenile court need operate in a vacuum concerning the results of the previous proceedings and the events emanating from an order issued after that hearing. This is especially true when a series of events and hearings culminated in the termination hearing and the testimony at the termination hearing laid a partial foundation for events happening after the earlier order by setting forth events leading up to the order. We conclude the procedure did not violate due process. In so doing we have not retreated from our previous statements in *In Interest of L.N., supra,* and *In Interest of R.H., supra,* and we have considered only the evidence and testimony introduced at the termination hearing for the resolution of the issues presented on this appeal.

The second subissue raised by Lee and Mary within the context of the juvenile court's finding of the elements necessary to terminate their parental rights is that the juvenile court erred in admitting into evidence the psychological reports and testimony of Dr. Helen Wilson. Dr. Wilson examined Lee and Mary as a result of the juvenile court order dated 31 August 1981.

■ Lee and Mary objected to the introduction of Dr. Wilson's reports and her testimony at the termination hearing on the basis of North Dakota Rules of Evidence 503(b), which provides as follows:

"A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of diagnosis or treatment of his physical, mental, or emotional condition, including alcohol or drug addiction, among himself, his physician or psychotherapist, and persons who are participating in the diagnosis or treatment under the direction of the physician or psychotherapist, including members of the patient's family."

The explanatory note to NDREv 503(b) provides that "only those communications

made 'for the purpose of diagnosis or treatment' are privileged."

Lee and Mary argued that the purpose and intent of the court-ordered psychological examinations were for diagnosis and treatment in order to help them become better parents.

We believe the juvenile court properly admitted the report and testimony of Dr. Wilson for two separate, but closely related, reasons.

North Dakota Rule of Evidence 503(d)(2) contains an exception to the psychotherapist-patient privilege and provides as follows:

"If the court orders an examination of the physical, mental, or emotional condition of a patient, whether a party or a witness, communications made in the course thereof are not privileged under this rule with respect to the particular purpose for which the examination is ordered unless the court orders otherwise."

Although the purpose of the court-ordered examination may, in part, have been to help Lee and Mary become better parents, we believe it would take a strained interpretation of NDREv Rule 503(d)(2) and the court order to conclude that the court order was not for purposes of monitoring the parent-child situation. This conclusion is buttressed by the fact that the court order directed that the reports be made available "to the Court, Social Service Board, and respective counsel" before the 6 October 1981 date when Lee and Mary regained custody of the four children.

■ The availability of the reports to those parties leads us to a separate reason for concluding that the juvenile court properly admitted the report and testimony of Dr. Wilson. The definition of a "confidential communication" set forth in NDREv 503(a)(4) provides that:

"A communication is 'confidential' if not intended to be disclosed to third persons, except persons present to further the interest of the patient in the consultation, examination, or interview, persons reasonably necessary for the transmission

of the communication, or persons who are participating in the diagnosis and treatment under the direction of the physician or psychotherapist, including members of the patient's family."

In this instance the court order required that the report would be disclosed to the court, social services, and counsel. The nature of the report and its use necessitates that the communications were not confidential as contemplated by NDREv 503(a)(4). Simple logic compels the conclusion that a report given to third parties is no longer confidential unless the third parties are under some constraint of confidentiality.

Having decided that the juvenile court properly admitted Dr. Wilson's report and testimony, and that the juvenile court could consider only the evidence introduced at the termination hearing, we turn to the major issue raised by Lee and Mary: Whether or not the evidence established by clear and convincing evidence the elements necessary to terminate the parental rights of Lee and Mary.

North Dakota Century Code § 27–20–44 deals with the termination of parental rights and provides, in relevant part, as follows:

"1. The court by order may terminate the parental rights of a parent with respect to his child if:

.    .    .    .    .

"b. The child is a deprived child and the court finds that the conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm."

■ Pursuant to NDCC § 27–20–44(1)(b), parental rights may not be terminated unless the juvenile court finds by clear and convincing evidence adduced at the termination hearing that: (1) the child is a deprived child; (2) the conditions or causes of the deprivation are likely to continue or will not be remedied; and (3) by reason of the continuous or irremediable

conditions and causes, the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm. *In Interest of L.N.,* 319 N.W.2d 801 (N.D.1982); *Kleingartner v. D.P.A.B.,* 310 N.W.2d 575 (N.D.1981); *In Interest of R.H.,* 262 N.W.2d 719 (N.D.1978).

NDCC § 27–20–02(5)(a) defines a "deprived child" as a child who

"Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for one child's physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of one child's parents, guardian, or other custodian."

This Court has defined "proper parental care" as being conduct by the parents in raising their children which satisfies the minimum standard of care which the community will tolerate. *In Interest of L.N., supra.* However, parental misconduct separately is not sufficient to terminate parental rights, there must also be a showing of a resultant harm to the child. *Kleingartner v. D.P.A.B., supra.*

■ Evidence of previous abuse and deprivation may be considered in determining whether deprivation is likely to continue. *Kleingartner v. D.P.A.B., supra.* However, evidence of past abuse and deprivation is not, by itself, enough to terminate parental rights; there must be a showing of present abuse and deprivation, the conditions and causes of which are likely to continue. *In Interest of L.N., supra.*

■ Our standard of review of decisions terminating parental rights is equivalent to the former procedure of trial de novo. *In Interest of L.N., supra; Kleingartner v. D.P.A.B., supra.* Although the juvenile court's findings are entitled to appreciable weight because it had an opportunity to observe the demeanor of the witnesses, this Court is not bound by those findings. *Kleingartner v. D.P.A.B., supra.*

■ We believe the evidence and testimony introduced at the termination hearing clearly and convincingly established the ele-

ments necessary to terminate the parental rights of Lee and Mary. We note that the parents were given an opportunity to correct their behavior but either declined or were unable to change. Our de novo review of the record at the termination hearing reveals a great amount of evidence regarding the physical health and the physical, mental, and emotional development of the children. This evidence was in the form of results from various developmental tests and physical examinations, as well as observations made of the four children. These tests establish that the children had experienced developmental regression and had some growth retardation and linked these deficiencies to their home environment. There was also evidence of bruises and physical abuse to at least one of the children; although we do recognize Lee and Mary denied this particular instance of abuse. Additionally, the foster parents testified concerning the children's adjustment to the foster home and their responses to visitation with the parents. The psychological report of Dr. Wilson and her testimony, which we have earlier concluded was admissible, contains the following relevant conclusions:

"The patient [Lee] shows some serious personality problems which would suggest that caution be used in a custody decision, or any decision placing the patient in a responsible position.... A person with this type of profile would be a danger to defenseless children, or even adults. The prognosis for recovery with treatment is not favorable.

. . . . .

"If this couple elect to continue their marriage, the Court may wish to consider termination of parental rights. The children are clearly in danger of harm at their father's hands, and the mother is psychologically unable to prevent or counteract his actions to protect her children. It is not wise to permit the parents to have custody of the children over the weekends without supervision."

Based on the foregoing, and our de novo review of the testimony and evidence presented at the termination hearing, giving appreciable weight of the opportunity of the trial judge to observe the demeanor of the witnesses, we conclude that the evidence is clear and convincing and the juvenile court did not err in terminating the parental rights of Lee and Mary.

■ The last issue raised by Lee and Mary is that the juvenile court did not have jurisdiction to hear the petition for termination of parental rights. The factual situation relevant to this issue is that a temporary order was signed by the juvenile court on 5 February 1982 ordering the return of the children to the custody of the director of Dickey County social services until such time as a hearing could be held on the violation of the 31 August 1981 order; the children were returned to North Dakota on or about 25 March 1982 and were then held in foster care without any judicial process; and that a petition for termination was not signed until 26 May 1982. Lee's and Mary's argument, as we understand it, is that once the children were returned to North Dakota pursuant to the temporary order and the alleged violations of the 31 August 1981 court order, the State could not proceed on a separate and distinct matter (termination of parental rights) having no relation to a hearing which should have been had on the alleged violation of the 6 August 1981 order.

Although we do not condone the time delay between the bringing the children back to North Dakota and the signing of the petition for termination of parental rights in this instance, our research has not revealed any authority, nor have any authorities been brought to our attention, which would prevent the State from bringing an independent termination proceeding.

The judgment terminating the parental rights of Lee and Mary is affirmed.

ERICKSTAD, C.J., VANDE WALLE and PEDERSON, JJ., and WILLIAM F. HODNY, District Judge, concur.

HODNY, District Judge, sitting in place of PAULSON, J., disqualified.